[Cite as *Ellis v. Treon*, 2014-Ohio-5010.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


DEBORAH ELLIS,                          :

    Plaintiff-Appellant,                :          CASE NO.   CA2014-03-021

    - vs -                                   :          O P I N I O N
                                              11/10/2014

                                            :

BRIAN TREON, M.D.,                      :

    Defendant-Appellee.                 :


CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2013 CVH 00579


Fox & Fox Co., L.P.A., Bernard C. Fox, Jr., M. Christopher Kneflin, P.O. Box 207, Amelia, Ohio 45102, for plaintiff-appellant

D. Vincent Faris, Clermont County Prosecuting Attorney, Darren D. Miller, 101 East Main Street, Batavia, Ohio 45103, for defendant-appellee


    **PIPER, J.**

    {¶ 1}  Plaintiff-appellant, Deborah Ellis, appeals a decision of the Clermont County Court of Common Pleas denying her motion to change her husband's cause of death as that cause had been determined by defendant-appellee, Dr. Brian Treon.

    {¶ 2}  Deborah's late husband, David Ellis, sustained an injury at work when he fell off the dump truck he was driving.  David injured his arm, side, and abdominal area as a result of

his fall. David first went to an urgent care facility, but Deborah later took him to the Clermont Mercy Hospital Emergency Room at the advice of the urgent care staff. At the emergency room, David was examined and received blood testing, an EKG, and a chest x-ray. The EKG indicated the existence of an old anterior septal wall myocardial infarction and poor R wave progression. David self-reported a history of smoking, and that he had been prescribed various medications for high blood pressure. David's medical history also indicated the presence of Chronic Obstructive Pulmonary Disease (COPD). David, who was 5'8" tall, weighed 240 lbs. when he was admitted to the emergency room. David was given Percocet and discharged, but continued to experience pain and nausea over the next few days.

{¶ 3} Three days after the initial accident, David saw his family physician who diagnosed David with thoracic strain, constipation, and nausea caused by an intolerance to Percocet. David's family physician discontinued the Percocet and prescribed Vicodin for pain and Phenergan for nausea. David's pain continued after he switched from Percocet to Vicodin, and Deborah indicated that David began to vomit a black liquid.

{¶ 4} Six days after the initial accident, David and Deborah woke up, and David requested scrambled eggs and bacon for breakfast. After eating very little of his breakfast, David told Deborah that he was going to lie back down in the bedroom. David fell to the ground while in the bedroom, and Deborah assisted him into the bathroom where he vomited black liquid. Deborah then helped David into the living room where he sat in a recliner and vomited more of the same black liquid. Deborah called 911, and within a short time, David became nonresponsive. The Monroe Township EMS responded and found David nonresponsive with no heart activity. Despite their resuscitation efforts, David passed away at his home.

{¶ 5} An autopsy was ordered by Dr. Treon, who is the Clermont County Coroner. All autopsies ordered by Clermont County are performed by the Hamilton County Coroner's

Office, and David's autopsy was performed by Dr. Jennifer Schott, a Hamilton County Deputy Coroner. Dr. Schott determined that David's cause of death was hypertensive cardiovascular disease. Dr. Treon concurred in Dr. Schott's conclusion as to David's cause of death, and such was officially listed on David's death certificate. Additionally, the Hamilton County Coroner's Office held a review of the procedures used to determine David's cause of death and all of the pathologists involved in the review agreed that David's death was caused by hypertensive heart disease.

{¶ 6} Deborah received Dr. Schott's report discussing David's cause of death and disagreed with some of the findings made by Dr. Schott. Deborah sent Dr. Schott a letter describing the events leading up to David's death as she remembered them, and asked Dr. Schott to reconsider the cause of death listed on David's death certificate. However, Dr. Schott did not change her opinion or alter David's cause of death in any manner in response to Deborah's disagreement.

{¶ 7} Two additional physicians reviewed David's full medical records and issued opinions as to David's cause of death. One physician, Dr. Matthew Burton, performed his review at the request of Deborah, and the other physician, Dr. Rohn Kennington, performed his review at the request of the Ohio Bureau of Workers' Compensation. However, neither of these two doctors examined David's body. The reports of these physicians disagreed with Dr. Schott's conclusion, and concluded that David's cause of death was narcotic toxicity as a result of the pain medication David had taken.

{¶ 8} Dr. Harry Plotnick, who has a doctoral degree in toxicology and acts as a consultant in forensic toxicology, also reviewed David's case and agreed with Dr. Schott that David's death was the result of hypertensive cardiovascular disease rather than narcotic toxicity.

{¶ 9} Deborah filed a complaint in the Clermont County Court of Common Pleas,

asking the court to order Dr. Treon to change the cause of death ruling on David's death certificate. The parties took depositions from some of the doctors who had opined as to the cause of death, including Drs. Schott, Treon, and Burton. The parties stipulated to the evidence in the record, and proceeded to a hearing before the trial court. After considering all of the stipulated evidence and arguments presented at the hearing, the trial court denied Deborah's request to change the cause of death. Deborah now appeals the trial court's decision, raising the following assignments of error. For ease of discussion, and because they are interrelated, we will address Deborah's assignments of error together.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT'S RATIONALE FOR ITS DECISION IS NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE AND ITS DECISION TO DISREGARD APPELLANT'S EXPERT TESTIMONY IS NOT SUPPORTED BY OBJECTIVE REASONING.

{¶ 12} Assignment of Error No. 2:

{¶ 13} THE TRIAL COURT ERRED BY FAILING TO FIND THERE WAS NOT COMPETENT CREDIBLE EVIDENCE PUT FORTH BY APPELLANT TO MANDATE A CHANGE IN THE CAUSE OF DEATH UNDER R.C. 313.19.

{¶ 14} Deborah argues in her two assignments of error that the trial court erred in denying her request to change David's cause of death.

{¶ 15} According to R.C. 313.19,

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

{¶ 15} "The coroner's factual determinations concerning the manner, mode and cause

- 4 -

of the decedent's death, as expressed in the coroner's report and death certificate, create a nonbinding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." *Vargo v. Travelers Ins. Co.*, 34 Ohio St. 3d 27, 30, (1987). A party seeking to change a cause of death determination according to R.C. 313.19 bears "the burden of establishing, by a preponderance of competent, credible evidence to the contrary, that the coroner's opinion was inaccurate." *Estate of Severt v. Wood*, 107 Ohio App. 3d 123, 129 (2d Dist.1995). On appeal, a trial court's decision in an action authorized by R.C. 313.19 is reviewed for an abuse of discretion. *TASER Internatl., Inc. v. Chief Med. Exam'r. of Summit Cty.*, 9th Dist. Summit No. 24233, 2009-Ohio-1519. A decision constitutes an abuse of discretion only when it is found to be unreasonable, arbitrary, or unconscionable. *Davis v. Butler Cty. Bd. of Revision*, 12th Dist. Butler No. CA2012-05-114, 2013-Ohio-3310.

{¶ 16} After reviewing the record, we find no abuse of discretion in the trial court's decision. The trial court considered the relevant evidence and determined that the opinions offered by Deborah's expert witnesses did not constitute competent, credible evidence to prove that the coroner's opinion was inaccurate. Deborah asserts that the trial court's decision was an abuse of discretion because the trial court did not accept her expert testimony as sufficient to rebut the statutory presumption that the coroner's determination was accurate. However, Ohio law is clear that a trial court is not required to accept expert testimony as determinative on an issue.

{¶ 17} "A trial court, in its role as a trier of fact, may choose to believe or disbelieve any witness, including an expert witness." *Sheehy v. Sheehy*, 12th Dist. Clermont No. CA2010-01-007, 2010-Ohio-2967, ¶ 16. Additionally, a trial court is not required to automatically accept an expert witness' testimony on any subject matter. *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, ¶ 71.

{¶ 18} The fact that Deborah presented evidence that her expert witness and one

- 5 -

other doctor attributed David's death to narcotic toxicity did not prove by the preponderance of the competent, credible evidence that the cause of death should have been changed. The court considered the reports, depositions of the various doctors, as well as the evidence and arguments presented at the hearing, and determined that Deborah had not presented enough evidence to overcome the presumption that the coroner ruled correctly.

{¶ 19} Dr. Schott testified that she is certified in anatomic, clinical, and forensic pathology, and that she performs approximately 200-250 autopsies each year as a deputy coroner. Dr. Schott testified that she based her cause of death determination upon the information deemed from David's medical history and the results of the autopsy. Among the relevant factors considered were such facts as: David's heart was enlarged, he had a history of high blood pressure, his left ventricle was very thick, and he exhibited pulmonary edema in his lungs. Dr. Schott also gave some consideration to the manner in which David died. Specifically, Dr. Schott testified that David's sudden fall to the ground was inconsistent with narcotic toxicity because when someone exhibits opioid intoxication, he appears to be sleeping, even snoring, and then goes unresponsive. Conversely, when encountering a sudden cardiac arrhythmia, a subject is more likely to fall suddenly.[1]

{¶ 20} When asked about what can cause sudden fatal cardiac arrhythmias, Dr. Schott testified that an electrical or electrolyte abnormality could be a contributing factor to death, but that the underlying death would still be the cardiovascular disease. Dr. Schott testified that the black liquid David vomited was likely old blood fragments attributed to an irritation of the gastric lining, but that she could not confirm David's electrolyte levels at the time of his death because such levels were never tested. Dr. Schott testified that even if she

---

1. While the parties tend to agree that David suffered from cardiac arrhythmia, they do not agree on what caused the arrhythmia. Dr. Schott clearly stated in her deposition that any arrhythmia experience was the result of David's cardiovascular disease, which was the stated cause of death.

had performed an electrolyte test, however, the results would not have changed the cause of death because the underlying cause was always heart disease and the electrolyte imbalance would only be a contributing factor.

{¶ 21} Dr. Treon testified that he agreed with Dr. Schott's cause of death, and that in his opinion, David died of hypertensive cardiovascular disease. Dr. Treon also testified that he based his opinion on the facts discovered during David's autopsy, including the enlarged heart, and that arrhythmia can be attributed to an enlarged heart. While Dr. Treon testified that it was possible that narcotics can cause arrhythmia as well, he stated that "you want to go with the one that we've got versus the one that we might have." Dr. Treon also testified that after his investigation into David's death, and following the other Hamilton County pathologists agreement with Dr. Schott as to her determination of David's cause of death, he ruled that David's death was caused by hypertensive heart disease.

{¶ 22} The court also considered a report from Dr. Harry Plotnick, a consultant in forensic toxicology. Dr. Plotnick reviewed David's records and the pertinent documentation, and concluded that Dr. Schott's cause of death was accurate. Dr. Plotnick stated that death from narcotic toxicity in the manner suggested by Dr. Burton was "extremely rare" and that David's warning signs pointed more particularly to heart disease. Dr. Plotnick focused on David's history of COPD, smoking, being overweight, and the EKG interpretation that David had anterior septal wall damage indicative of an old myocardial infarction. Based upon the pertinent information, Dr. Plotnick accepted Dr. Schott's opinion that David's cause of death was hypertensive cardiovascular disease.

{¶ 23} To rebut the evidence offered through the testimony and reports from Drs. Schott, Treon, and Plotnick, Deborah presented the report and deposition testimony of Dr. Matthew Burton, who is certified in internal medicine and rheumatology. Dr. Burton testified that he reviewed the records pertinent to David's death, including the coroner's report,

toxicology reports, notes from the urgent care and emergency room, photographs taken of David after his passing, the letter from Deborah to Dr. Schott, and Dr. Kennington's report for the Bureau of Workers' Compensation.

{¶ 24} Dr. Burton testified that while David exhibited signs of high blood pressure, none of David's organs showed any damage from high blood pressure. Dr. Burton also testified that there was no evidence of arteriosclerotic heart disease, and that in his opinion, David's cause of death should have been listed as cardiac arrhythmia induced by protracted vomiting based on narcotic toxicity. In Dr. Burton's opinion, David's vomiting for an extended period of time led to an electrolyte disturbance, which resulted in David's sudden death from cardiac arrhythmia. However, most of Dr. Burton's testimony as to the harm caused by the vomiting was stated in possibilities, rather than certainties, as to what actually happened in the days and hours preceding David's death.

{¶ 25} For example, in Dr. Burton's report, he stated "with all of the vomiting that [David] experienced, he *could have* excreted a great deal of acid and he *could have* developed a metabolic alkalosis where the pH is very high and in which case potassium is very low." (Emphasis added.) Dr. Burton's report goes on to state,

> when one vomits, one *can* induce a vagal reaction or a slowing of the heartbeat. This setting of prolonged vomiting causing increase in vagal tone and depression of the cardiac rate plus changes in the pH *could make* [David] highly susceptible to a cardiac arrhythmia and he *could lose* consciousness and subsequently die of heart failure from a cardiac arrhythmia induced by the narcotics.

(Emphasis added.)

{¶ 26} Moreover, Dr. Burton's report indicates that pulmonary edema induced by narcotics is usually associated with intravenous narcotic abuse, such as that connected with heroin use. Even so, Dr. Burton concluded, "one cannot rule out *the possibility* of primary; that is, direct pulmonary toxicity or the development of pulmonary edema from the ingestion

of large quantities of narcotics." (Emphasis added.) These statements taken from Dr. Burton's report are couched in terms of what could have happened, what can happen, and not ruling out the possibility of a narcotics-related death, rather than definitively establishing what actually happened in David's case.

{¶ 27} As another example, and to support his opinion that David ingested large amounts of narcotics, Dr. Burton relied upon a report by the sheriff's office, which indicated that on the day of David's death, officers inventoried one oxycodone tablet from a prescription of 50, and 33 hydrocodone tablets from a prescription of 50. Despite there being no evidence that David actually took 49 oxycodone or 17 hydrocodone tablets, Dr. Burton assumed as much when forming his opinion. Dr. Burton made his assumption without any evidence that David ingested the narcotics, and without any indication as to when David may have taken the pills.[2]

{¶ 28} Similarly, Dr. Burton's opinion that David died of cardiac arrhythmia because of prolonged vomiting was premised upon David having vomited continually over an extended amount of time. However, the record does not demonstrate that David vomited to such a degree. While Deborah mentioned that David began vomiting a black substance that started on July 5th and continued until the day of his death on July 8th, the other medical records regarding David's treatment do not indicate the presence of heavy vomiting.

{¶ 29} David's medical records, at most, indicate the presence of nausea, for which David was prescribed an anti-nausea medication by his family physician. When David visited his family physician complaining of pain and nausea, there is no indication in that medical record that David complained of vomiting or that he had vomited profusely for days. Even if

---

2. The trial court noted that Dr. Burton theorized that David took so many pills because he was continually vomiting them up. The trial court concluded, and we agree, that Dr. Burton's testimony on this aspect is speculative because there is no evidence that David vomited the pills up immediately.

David had been vomiting profusely for days, Dr. Burton's testimony was still speculative as to the effects an imbalanced pH level could have on David, and what could happen when someone vomits. Dr. Burton did not, and could not, testify as to whether David in fact suffered an electrolyte imbalance, as no such testing was performed and there is nothing in the record to definitively establish that David's cause of death was related to his vomiting.

{¶ 30} On cross-examination, Dr. Burton admitted that pulmonary edema would be found in a person who died from a heart attack and that pulmonary edema was found in David's lungs during his autopsy. Dr. Burton also testified that David had several risk factors related to heart problems, including a history of smoking, morbid obesity, depression, and high blood pressure. Dr. Burton also admitted that none of David's medical records indicated the presence of arrhythmia. Regarding the toxicity findings, Dr. Burton admitted on cross-examination that David's toxicology tests showed that he had only a therapeutic level of hydrocodone, oxycodone, and metabolites in his system at the time of his death.

{¶ 31} The depositions and arguments made at the hearing presented the trial court with competing expert testimony as to David's cause of death. No less than three doctors opined that David's cause of death was hypertensive cardiovascular disease. Drs. Schott, Treon, and Plotnick all expressed their opinions that David's death was caused by his hypertensive cardiovascular disease as indicated by the autopsy results and David's history of COPD, an enlarged heart, smoking, obesity, high blood pressure, as well as a past myocardial infarction. Two other doctors opined that David's death was more immediately caused by narcotic toxicity, which eventually made David's heart stop beating.

{¶ 32} The trial court reviewed and considered all of the pertinent exhibits, reports, and expert testimony before determining that there was not competent, credible evidence to overturn the coroner's stated cause of death. The trial court reiterated that much of Dr. Burton's testimony and opinions were based on speculation, and that such testimony did not

present the competent, credible evidence needed to overcome the presumption that the coroner's cause of death was correctly determined. The trial court did not find the opinion of Dr. Kennington to represent the requisite competent, credible evidence needed to overcome the rebuttable presumption, especially when compared to the testimony and reports of Drs. Treon, Schott, and Plotnick.

{¶ 33} After fully reviewing the record, we find that the trial court did not abuse its discretion in denying Deborah's request to order the coroner to change the cause of David's death. As such, Deborah's assignments of error are overruled.

{¶ 34} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.